GUNNISON et al. v. CHICAGO, M. & ST. P. RY. CO. et al.

(Circuit Court, W. D. Wisconsin. July 23, 1902.)

1. JUDICIAL SALE—DECREE FOR ENFORCEMENT OF JUDGMENT AGAINST RAIL-
ROAD—PROPERTY PASSING.

A judgment was obtained against a railroad company of Wisconsin, where, by statute, judgments are made liens on real estate. The holder of the judgment subsequently filed a bill in equity, and obtained a decree, ordering a sale of the company's road and its franchise to satisfy the judgment, and such sale was made and confirmed. *Held*, that the sale vested the purchaser with the entire title of the railroad company which it had at the date of the rendition of the judgment, not only to the physical property sold, but also to the franchise to operate the same as a railroad.

2. LIMITATIONS—ADVERSE POSSESSION—RAILROAD.

A railroad company which purchased a line of road, under a judicial decree ordering a sale of the road and its franchise to satisfy a judgment, and took and retained possession claiming title as against a mortgage executed subsequent to the judgment, which it refused to recognize or pay, held adversely to the mortgagees, and, under the statute of Wisconsin (Rev. St. 1898, § 4211), a suit by the mortgagees to enforce a lien upon the property was barred in 10 years.

3. EQUITY—LACHES—DELAY IN ENFORCING RAILROAD MORTGAGE.

Defendant railroad company purchased a line of road in 1867 under a decree ordering it sold to satisfy a judgment which was rendered in 1857. Defendant took possession, and thereafter retained and operated the road, incorporating it in its system, making large improvements, and paying off prior incumbrances to the amount of $3,000,000. Subsequent to the judgment under which the sale was made, the road had been sold under a mortgage of later date, and the purchasing company had issued bonds secured by a mortgage thereon. In 1868 a suit was brought by the trustee in such mortgage against defendant to enforce the mortgage, but was dismissed in 1872 without trial. In 1898 complainants, claiming to be the owners of most of the bonds secured, brought the present suit to enforce the mortgage against the road. Defendant had never recognized the validity of such mortgage as against its own title, and no part of the bonds, either principal or interest, had ever been paid. *Held*, that there had been such gross laches on the part of the trustee and bondholders as to debar them from the right to maintain the suit.

## In Equity. Suit to foreclose railroad mortgage.

The brief of defendants' counsel contains a statement of the principal facts of this case, so succinctly stated that I have copied it mainly into this opinion, having verified it in all things by the testimony and record, which are quite voluminous. In the year 1857, the La Crosse & Milwaukee Railroad Company, a corporation of Wisconsin, was the owner of a railroad and its franchises extending from Milwaukee to La Crosse by way of Beaver Dam and Horicon, subject to certain mortgage and judgment liens. The railroad was treated by the company as consisting of two divisions,—one called the Eastern Division, extending from Milwaukee to Portage, a distance of 95 miles, and the other called the Western Division, extending from La Crosse to Portage City, a distance of 105 miles. Stated in the order of priority, the mortgage liens were as follows: The Eastern Division: (1) The Palmer mortgage, to secure an issue of bonds to the amount of $950,000 and interest; (2) the city of Milwaukee mortgages, to secure an issue of bonds to the amount of $314,000 and interest; (3) the Bronson and Soutter mortgage, to secure an issue of bonds to the amount of $1,000,000 and interest. The Western Division: (1) The Bronson, Soutter, and Knapp mortgage, known as the "Land Grant Mortgage," to secure an issue of bonds to the amount

---

¶ 2. See Adverse Possession, vol. 1, Cent. Dig. § 444.

of $4,000,000 and interest; (2) the Helfenstein mortgage, to secure an issue of bonds to the amount of $200,000 and interest.

Stated in the order of priority, the judgments which had been rendered against that company, and which were liens on both the Eastern and Western Divisions of the railroad, were as follows: (1) The Chamberlain judgment, recovered in the circuit court of the United States for the district of Wisconsin, on the 2d day of October, 1857, for $629,089.72; (2) the Cleveland judgment, recovered in the circuit court of the United States for the district of Wisconsin, on the 7th day of October, 1857, for $111,727.31.

The circuit court of the United States for the district of Wisconsin, on the 7th day of January, 1867, in a suit brought to enforce the lien of the Cleveland judgment, adjudged and decreed that judgment to be a lien upon the railroad, property, and franchises of the La Crosse & Milwaukee Railroad Company as and from the date of its rendition; and, on appeal to the supreme court of the United States, that court, in March, 1868, affirmed the decree. Railroad Co. v. James, 6 Wall. 750, 18 L. Ed. 854. See, also, Howard v. Railroad Co., 101 U. S. 837, 25 L. Ed. 1081, and Barnes v. Railroad Co., 122 U. S. 1, 7 Sup. Ct. 1043, 30 L. Ed. 1128.

On the 1st day of June, 1858, the La Crosse & Milwaukee Railroad Company placed another mortgage upon its entire railroad, property, and franchises, to secure the payment of $2,000,000 of bonds, known as the "Barnes Mortgage." Default was made in the first installment of interest which became due on these bonds, whereupon a statutory foreclosure of the mortgage by advertisement was had, and on the 21st day of May, 1859, the property covered by the mortgage was purchased by Barnes, as trustee. Two days afterwards Barnes united with certain persons representing themselves to be the owners of certain of the bonds, and organized the Milwaukee & Minnesota Railroad Company, whereupon Barnes transferred his purchase to that company. On the 24th day of October, 1864, the last-named company executed a mortgage to James H. Fonda and G. Hilton Scribner, as trustees, to secure an issue of bonds to the amount of $600,000, which, by their terms, became due July 1, 1884. It is this mortgage which is now in suit. It included only the 95 miles of railroad from Milwaukee to Portage, formerly the Eastern Division of the La Crosse & Milwaukee Railroad Company.

The La Crosse & Milwaukee Railroad Company was not in possession of its railroad at the time the Barnes mortgage was given, nor at any time subsequent thereto, but such railroad was in the possession of and operated by receivers under liens prior to the Barnes mortgage. The Western Division, covering the railroad from Portage City to La Crosse, was sold in April, 1863, under the foreclosure of the land grant mortgage, to purchasers who organized the Milwaukee & St. Paul Railway Company, now the Chicago, Milwaukee & St. Paul Railway Company; while the Eastern Division, embracing the railroad from Milwaukee to Portage City, was turned over to the Milwaukee & Minnesota Railroad Company on the 20th day of January, 1866, in pursuance of an order made by the circuit court of the United States for the district of Wisconsin in a suit to foreclose the Bronson and Soutter mortgage, which order provided that upon that company paying into court the interest due on the bonds issued under that mortgage, amounting to $462,057.80, it would be let into possession of the railroad from Milwaukee to Portage.

On the 18th day of April, 1866, Frederick P. James, who by mesne assignments had become the owner of the Cleveland judgment, filed a bill of complaint in the circuit court of the United States for the district of Wisconsin, against the Milwaukee & Minnesota Railroad Company, to enforce the lien of that judgment, which bill prayed, among other things, that the Eastern Division of the La Crosse & Milwaukee Railroad Company, being the railroad from Milwaukee to Portage, might be decreed to be sold under the order and direction of the court, subject to the aforesaid Palmer, the city of Milwaukee, the Bronson and Soutter mortgages and the Chamberlain judgment. The Milwaukee & Minnesota Company appeared and filed its answer to the bill, and in due course of procedure a decree was entered on the 7th day of January, 1867, adjudging that there was then due on said Cleveland judgment the sum of $98,801.51, and that said judgment was a lien,

charge, and incumbrance, as of the date of October 7, 1857, upon all the right, title, and interest which the La Crosse & Milwaukee Railroad Company had of, in, and to the railroad from Milwaukee to Portage City, together with its rolling stock, franchises, and appurtenances; that all and singular the railroad formerly known as the La Crosse & Milwaukee Railroad, from Milwaukee to Portage, its depots, station houses, and buildings, together with all its rolling stock, franchises, and appurtenances then in the possession of, or claimed by, the Milwaukee & Minnesota Railroad Company, be sold at public auction by the marshal of the district, unless prior to such sale said last-named company pay to the complainant or to said marshal the amount adjudged to be due on said judgment, with interest and costs; that the sale be made at the post office in the city of Milwaukee on the 2d day of March next ensuing, at 2 o'clock in the afternoon; that the marshal give public notice of the time and place of such sale, by publishing the same four weeks in some daily newspaper published in the city of Milwaukee; that the sale be made subject to the aforesaid mortgages and judgment liens; that the marshal, upon the confirmation of said sale by the court, execute and deliver a deed to the purchaser; that the Milwaukee & Minnesota Railroad Company, and all persons claiming or to claim from or under it, be forever barred and foreclosed of and from all equity of redemption, and claim of, in, and to the railroad, rolling stock, franchises, and appurtenances aforesaid; that the purchaser at such sale be let into possession thereof, and that said defendant company deliver possession thereof to such purchaser, on production of the marshal's deed for such property, and a certified copy of the order confirming the report of sale.

In pursuance of the aforesaid decree, a sale of the railroad property and franchises from Milwaukee to Portage was had on the 2d day of March, 1867, and said property was sold to the Milwaukee & St. Paul Railway Company for $100,920.94, it being the highest and best bidder. The sale was confirmed, and on the 5th day of the same March the marshal's deed was delivered to the purchasing company; whereupon it entered into possession of said railroad property and franchises, claiming to be the owner thereof under said decree, sale, and deed, subject to the aforesaid Palmer, city of Milwaukee, Bronson, and Soutter mortgages and the Chamberlain judgment, and has ever since continued in possession thereof, which possession, it is claimed, has been actual, open, notorious, and adverse, without in any manner accounting to the trustees or bondholders under the Fonda and Scribner mortgage, or in any way recognizing said mortgage, or the debt secured thereby, as a valid or existing lien upon said railroad property or franchises; nor has it during such time in any form or manner recognized the trustees named in said mortgage, or those holding the bonds secured thereby, as having any interest in said railroad property or franchises.

On the 2d day of March, 1867, the complainants Albert C. Gunnison and Aaron S. Bright, claiming to be stockholders in the Minnesota Company, filed a sworn petition in the circuit court of the United States for the district of Wisconsin, in the James suit, praying, among other things, that an appeal be allowed from the decree in that suit to the supreme court of the United States, and that they be allowed to use the name of the Milwaukee & Minnesota Railroad Company in taking such appeal. The court granted their petition; whereupon an appeal was taken by said Gunnison and Bright, in the name of the Milwaukee & Minnesota Railroad Company, from said decree to the supreme court of the United States. This appeal came on for argument before the supreme court, and on the 16th day of March, 1868, that court rendered its decision, affirming said decree. Railroad Co. v. James, 6 Wall. 750, 18 L. Ed. 854.

On the 31st day of January, 1868, G. Hilton Scribner, as surviving trustee under the mortgage given by the Milwaukee & Minnesota Railroad Company to Fonda and Scribner, as trustees (the mortgage now in suit), filed his bill of complaint in the circuit court of the United States for the Eastern district of Wisconsin, making the Milwaukee & St. Paul Railway Company and the Milwaukee & Minnesota Railroad Company the parties defendant thereto. Subpoenaes were duly served and jurisdiction acquired of each defendant. The bill, after setting forth the organization and powers of the

La Crosse & Milwaukee Railroad Company, the execution of the land grant and Barnes mortgages, their foreclosure, the organization of the Milwaukee & St. Paul Railway Company and the Milwaukee & Minnesota Railroad Company, the execution of the Fonda and Scribner mortgage by the last-named company, and the issuance of the bonds thereunder, proceeds to state: (1) That on the 7th day of October, 1857, Cleveland recovered a judgment against the La Crosse & Milwaukee Railroad Company, as hereinbefore stated; that Frederick P. James, as the assignee and owner of said judgment, on the 18th day of April, 1866, filed his bill of complaint in the circuit court of the United States for the district of Wisconsin, against the Milwaukee & Minnesota Railroad Company, sole defendant, praying that it be decreed by the court that the railroad of the Eastern Division of said La Crosse Company, with its rolling stock and franchises, be sold to pay that judgment; that afterwards, at the January, 1867, term of said court, a decree was rendered upon said bill adjudging said judgment to be a lien and incumbrance upon said Eastern Division, its station houses, buildings, rolling stock, and franchises, as of the date of October 7, 1857, and ordering the sale of said railroad property and franchises to pay the amount adjudged to be due on said judgment; that in pursuance of said decree said railroad property and franchises were sold by the marshal on the 2d day of March, 1867, to the Milwaukee & St. Paul Railway Company, for the sum of $100,920.94; that on the 5th day of the same March the sale was confirmed by the court, and on the following day the purchasing company went into possession of the property so purchased, and had ever since remained in possession thereof. (2) That the Cleveland judgment, upon which said decree was rendered, was not then, and never had been, a charge or incumbrance upon the Eastern Division of the La Crosse & Milwaukee Railroad Company, and that that division could not lawfully be subjected to the payment of said judgment, and that the decree upon said judgment was of no force or effect as against the complainant, or the bondholders whom he represented, for the reason that they were not parties to said James suit, and that the right to contest said judgment, and to redeem said railroad property and franchises from any and all existing incumbrances thereon, remained unaffected by the decree and sale under said judgment. (3) That the Milwaukee & St. Paul Railway Company had been in the exclusive possession and control of said Eastern Division for 10 months then last past; had received all the earnings and income thereof; that, while the complainant had no means of knowing the exact amount of the net earnings, yet, judging from the amount of business done during that 10 months, he believed that such earnings had exceeded $250,000; that said last-named company had not used or applied any part of said net earnings to the payment of the interest due on the bonds issued under the Palmer, City of Milwaukee, and Bronson and Soutter mortgages, but was converting said earnings to its own use; that it did not intend to apply said earnings towards the payment of said interest, or to pay said interest, but, on the contrary, it was the avowed and well-known purpose and intent of said company to suffer said interest to remain unpaid until successive defaults should so increase the amount due and unpaid as to render it impossible for the complainant or any person claiming under the Milwaukee & Minnesota Railroad Company, or any creditors thereof, to redeem said railroad or to save it from forfeiture, —all of which conduct on the part of said company was a fraud upon the complainant, and wholly destructive of the rights and interests of the bondholders under his trust deed. (4) That the complainant was advised and believed, and therefore insisted, that the Cleveland judgment, under which the Milwaukee & St. Paul Railway Company claimed to be a purchaser and owner of said Eastern Division, was not a lien upon said railroad, and could not lawfully be enforced against the Milwaukee & Minnesota Railroad Company; yet he insisted that, if said judgment should be adjudged a valid lien and incumbrance, the same had been fully paid and satisfied out of the net earnings which the Milwaukee & St. Paul Railway Company had received since it went into possession of said railroad; and if it should appear upon an accounting that the net earnings of said Eastern Division had been insufficient to pay the amount of the Cleveland judgment, with interest thereon,

the complainant was entitled to redeem said road by the payment to the Milwaukee & St. Paul Railway Company of the deficiency, and to have the possession of said road and property forthwith delivered to him upon paying such deficiency.

The bill prayed for relief, as follows: (1) That the Milwaukee & St. Paul Railway Company be enjoined from selling, mortgaging, or incumbrancing said Eastern Division, and the rolling stock and property belonging thereto; that an account be stated concerning the net earnings of said Eastern Division from the time that company took possession thereof under the marshal's sale, and of the amount paid that company, on the purchase of said Eastern Division with interest thereon; and that the amount of said net earnings be paid to a receiver, to be appointed, and applied to the payment of the interest accrued on the bonds secured by mortgages on said Eastern Division; or (2) that, in case it should be held that the Cleveland judgment was a valid lien and incumbrance upon the Eastern Division superior to the lien of the complainant's trust deed, it be adjudged that the Milwaukee & St. Paul Railway Company pay to such receiver the surplus of such net earnings which shall remain after full payment and satisfaction of the full amount of the Cleveland judgment, with interest and costs; and in case the amount of such net earnings should be found on accounting to be insufficient to pay in full the Cleveland judgment, with interest and costs, that the amount of such deficiency be ascertained, and, upon payment thereof by the complainant to the Milwaukee & St. Paul Railway Company, the possession, use, and control of the Eastern Division, with all the property, rights, and franchises, be forthwith delivered to the complainant as trustee for the bondholders under his mortgage.

After the filing of said bill, and the service of the subpœnaes upon the defendants therein, on motion of complainant's solicitor an order was made by the court on the 2d day of March, 1868, that the defendants plead, answer, or demur to the bill on or before the first Monday of April, 1868, or the same would be taken as confessed against them. No further proceedings seem to have been taken in that suit until February 26, 1872, nearly four years after, on which day, on motion of complainant's counsel, it was ordered by the court that the bill be dismissed, and thereupon it was dismissed.

No further action on the part of the trustees under the Fonda and Scribner mortgage, or of the holders of the bonds pretended to have been secured thereby, was taken until May, 1893, about 21 years after the dismissal of the Scribner bill, at which time Richard Carmen Combes, under an arrangement with the aforesaid Albert C. Gunnison and Aaron S. Bright, who claimed to own and control $336,000 of the bonds issued under said mortgage, attempted to bring an action at law against the Milwaukee & Minnesota Railroad Company in the circuit court of Milwaukee county, Wis., on $332,000 of said bonds. Jurisdiction was attempted to be acquired by procuring an order for the publication of the summons under the state practice. Such an order was made by the court. Thereupon D. W. Keyes, upon the ground that he was a stockholder of the Milwaukee & Minnesota Railway Company, if it existed as a corporation, moved to set aside the order for the service of the summons. The motion was denied, and from the order denying the motion an appeal was taken to the supreme court of the state, and that court held that the Milwaukee & Minnesota Railroad Company had, long prior to the time of the commencement of the action, voluntarily surrendered all of its corporate franchises, that the same had been accepted by the state, and therefore no action could be brought against it.

No further action was taken respecting the Fonda and Scribner mortgage, or the bonds issued thereunder, until the 30th day of March, 1897, 25 years after the Scribner bill was dismissed, on which day the present suit was brought by the filing of a bill of complaint in this court, making Albert C. Gunnison and George A. Bright, as administrator of Aaron S. Bright, deceased, and Howard J. Forker, as trustee, complainants, and the Chicago, Milwaukee & St. Paul Railway Company and G. Hilton Scribner, as trustee, defendants.

The bill of complaint in the present suit sets forth: (1) The execution of the Fonda and Scribner mortgage, the recording of the same in the office of

the secretary of state of Wisconsin, the issuance of the bonds thereunder, and, that at the time of the execution of said mortgage the Milwaukee & Minnesota Railroad Company was seised and possessed of all and singular the railroad property and franchises described in the mortgage, subject to the liens mentioned therein, and to the lien of the Cleveland judgment. (2) That on the 7th day of October, 1857, Cleveland recovered a judgment against the La Crosse & Milwaukee Railroad Company in the circuit court of the United States for the district of Wisconsin, for the sum of $111,727; that such judgment was a lien upon the railroad mentioned in the aforesaid mortgage from Milwaukee to Portage City; that James became the owner of said judgment, and on the 18th of April, 1866, filed a bill in the circuit court of the United States for the district of Wisconsin against the Milwaukee & Minnesota Railroad Company without making the trustees under the mortgage, or any of the holders of the bonds issued thereunder, parties defendant, for the purpose of establishing said judgment as a lien upon said railroad property and franchises, and obtaining a decree for the sale thereof to satisfy said lien; that such proceedings were had that on the 11th day of January, 1867, a decree was therein made adjudging that there was then due upon said Cleveland judgment $98,801.51; that the same was a lien upon all the interest of the La Crosse & Milwaukee Railroad Company in its railroad, rolling stock, franchises, and appurtenances, from Milwaukee to Portage, as of the date of October 7, 1857; that said property should be sold by the marshal to satisfy said lien, and that the Milwaukee & Minnesota Railroad Company, and all persons claiming or to claim under them, should be barred and foreclosed of and from all equity of redemption and claim to said property, unless the amount of said judgment, interest, and costs should be paid before the day of sale; that on the 2d day of March, 1867, the marshal sold said railroad property and franchises to the Milwaukee & St. Paul Railway Company for the amount due on said judgment, interest and costs; that said sale was confirmed by the court; that the marshal thereupon made and delivered his deed to that company, whereupon it went into possession of said property, and has continued in possession thereof under said decree, sale, and deed. (3) That said Cleveland judgment was not a lien upon the franchises of the La Crosse & Milwaukee Railroad Company, and in no manner affected the same, notwithstanding that the decree entered on the Cleveland judgment adjudged it to be a lien upon such franchises; that such franchises were not sold by the marshal under said decree, nor conveyed by his deed to the Milwaukee & St. Paul Railway Company, nor has it ever enjoyed, held, or operated said road by virtue of said franchises, or any part thereof, or, if said franchises were sold and conveyed to that company, they were sold and conveyed subject in all respects to the prior lien on them of the Fonda and Scribner mortgage; that the sale of said franchises under said Cleveland judgment to the Milwaukee & St. Paul Railway Company did not and could not affect the priority of the lien of said Fonda and Scribner mortgage on said franchises, and that said mortgage has continued to be and still is a lien on such franchises in the hands and in the possession of the Milwaukee & St. Paul Railway Company (now Chicago, Milwaukee & St. Paul Railway Company), and that a sale of said franchises separate and apart from the railroad and fixtures covered by said mortgage would prove an inadequate remedy, and be wholly insufficient to satisfy the debt secured thereby. (4) That the reasons why the Milwaukee & Minnesota Railroad Company is not joined as a party defendant to the bill are that, for more than 29 years prior to the filing of the bill, that company has not owned or possessed any property in the state of Wisconsin or elsewhere, or been engaged in any business whatever, nor has there during that time been held any meeting of the shareholders, directors, or officers, nor has that company, or any officer thereof, had any office or place of business of the company, either in the city of Milwaukee or elsewhere, and at the time of the sale of the railroad property and franchises, and at the time of the marshal's sale to the Milwaukee & St. Paul Railway Company, the Minnesota Company was, and up to the time of its dissolution continued to be, very largely indebted, having no property of any kind with which to pay its debts, utterly without credit, means, officers, and corporate functions, and

absolutely disorganized and insolvent; that long before the filing of the bill said company had voluntarily surrendered to the state of Wisconsin all its corporate franchises, and such surrender had been accepted by the state, and such surrender and acceptance had been adjudged by the supreme court of the state of Wisconsin in the aforesaid Combes suit, reported in 89 Wis. 297, 62 N. W. 89, 27 L. R. A. 369, 46 Am. St. Rep. 839. (5) That the complainants Albert C. Gunnison, and George A. Bright, as administrator of Aaron S. Bright, deceased, are the lawful owners and holders of 500 of said 600 bonds secured by said Fonda and Scribner mortgage; that the same are due and unpaid, together with all interest accruing thereon from the time of the issue, negotiation, and delivery of said bonds, and that no part of the principal or interest of said bonds has ever been paid; that said bonds were not presented for payment for the reason that the Minnesota Company was at the time disorganized, and had not then any office or place of business in the city of Milwaukee or elsewhere, and that there was no officer or person representing said company to whom said bonds could have been presented for payment.

The relief prayed for in the bill is as follows: (1) That the amount due and unpaid upon the bonds secured by the mortgage, principal and interest, may be found, adjudged, and decreed. (2) That said mortgage may be decreed a lien on the roadbed and fixtures, as well as on the franchises, of the railroad in the possession of the Chicago, Milwaukee & St. Paul Railway Company. (3) That said mortgage may be foreclosed, and the order of its priority as a lien upon said roadbed decreed and established, and that it be determined what liens, if any, are entitled to a priority or precedence over it. (4) That it may be decreed that the Chicago, Milwaukee & St. Paul Railway Company obtained its right, title, and interest in and to said railroad property and franchises, subject to said mortgage, as an actual subsisting lien thereon, and that the equity of redemption of the Milwaukee & Minnesota Company in said premises, existing upon the making and delivery of said mortgage, became and was vested in the Chicago, Milwaukee & St. Paul Railway Company under said decree, sale, and marshal's deed in the James suit, and that the complainants have the same right to have the said mortgage foreclosed as if said decree, sale, and deed had not been made, and as if the Milwaukee & Minnesota Railroad Company was still an existing corporation. (5) That it may be decreed that said railroad and its appurtenances be sold in order to pay the amount found to be due upon said bonds, and that the usual deed be made upon such sale and the confirmation thereof. (6) That all conditions which the court shall deem necessary to complainants' right to relief be imposed upon them.

The amended and substituted answer of the defendant company is as follows: (1) That whether the Milwaukee & Minnesota Railroad Company ever made, executed, or delivered the Fonda and Scribner mortgage, or issued its bonds for the amount of $600,000, or any other amount, or caused said bonds, or any of them, to be negotiated or sold, or received the proceeds thereof, or whether the complainants, Gunnison and Bright, are the owners of 500 or any other number of said pretended bonds, the defendant company has no information save from said bill, and therefore denies the same, and calls for proof thereof. (2) It admits the recovery of the Cleveland judgment, and that it was a lien upon the railroad mentioned in the bill; that by mesne assignments, James became the owner thereof; that James brought suit thereon against the Milwaukee & Minnesota Railroad Company as sole defendant, to enforce the lien thereof; that a decree was entered in said suit resulting in a sale of said railroad property and franchises to the Milwaukee & St. Paul Railway Company; that said sale was confirmed; that said company went into possession of said railroad property, and the franchises under said decree, sale, and deed, and since then has continued in possession thereof; and that long prior to the bringing of this suit, to wit, in 1872, the Milwaukee & Minnesota Railroad Company voluntarily surrendered to the state of Wisconsin all of its corporate franchises, and that such surrender was in that year accepted by the state, as adjudged by the supreme court of the state of Wisconsin in the aforesaid Combes suit. (3) It denies that the Cleveland judgment was not a lien upon the franchises of the La Crosse &

Milwaukee Railroad Company, and alleges that it was a lien upon the franchises of that company to maintain and operate the railroad of that company, and that the decree in the James suit so adjudged the same, and that the railroad, franchises, and property were sold by the marshal, and conveyed by his deed in the James suit, and it denies that such franchises were in any way sold or conveyed subject in any respect to the Fonda and Scribner mortgage. (4) The answer also set up certain statutes of limitation. (5) It avers that it is true, as stated in the bill of complaint, that neither of the trustees under the Fonda and Scribner mortgage were made parties defendant to the James suit brought to enforce the Cleveland judgment, but that on January 31, 1868, G. Hilton Scribner, as sole surviving trustee under said mortgage, filed his bill of complaint, in the same court in which the James suit was brought and prosecuted to final decree, against the Milwaukee and St. Paul Railway Company and the Milwaukee & Minnesota Railroad Company; that jurisdiction of both defendants was acquired, and that under the allegations and prayer of said bill every question which could have been litigated or determined, and every right which could have been saved or protected, in said James suit, if the trustees had been parties thereto, could have been litigated, determined, saved, and protected in said suit brought by said Scribner, and that, said Scribner having voluntarily abandoned said suit and caused the same to be dismissed, the complainants are now estopped from claiming that they have not had their day in court in the James suit as fully as if they had been made parties defendant therein, or from having or claiming any of the relief prayed for in the bill of complaint herein. (6) It sets forth the recovery of the Cleveland judgment; the suit of James to enforce the same; the decree, sale, and deed therein; the possession of the railroad property and franchises by the defendant Chicago, Milwaukee & St. Paul Railway Company thereunder, all with the full knowledge of the trustees under the Fonda and Scribner mortgage, and of said Albert C. Gunnison and Aaron S. Bright; and avers that the title of the Chicago, Milwaukee & St. Paul Railway Company to said railroad property and franchises became effective as of the 7th day of October, 1857, and is full, perfect, and complete, and is exclusive of any right, title, claim, or interest under or by virtue of the mortgage or trust deed set out in the bill of complaint. (7) It avers that, by means of the deed resulting from the James suit, the defendant railway company acquired the legal title to the railroad and franchises in question, and went into possession thereof under said deed, and that at the time of such possession the same were incumbered by mortgages as follows, to wit: First. The Palmer mortgage to secure an issue of bonds to the amount of $950,000 and interest, which bonds by their terms became due on the 30th day of June, 1874; that at the time of such possession there were still unpaid and outstanding $875,000 of such bonds, which were paid by the defendant company during the years 1876 and 1877, the last payment having been made on the 25th day of April, 1877. Second. The city of Milwaukee mortgages to secure an issue of bonds to the amount of $314,000 and interest; that $200,000 of said bonds, by their terms, became due and payable September 1, 1873, and the remaining $114,000 became due and payable on the 1st day of September, 1874; that after defendant railway company took possession of said railroad as aforesaid, and on the 26th day of July, 1876, it paid the full amount of said bonds, to wit, $314,000 and interest. Third. The Bronson and Soutter mortgage to secure an issue of bonds to the amount of $1,000,000 and interest, which bonds by their terms became due and payable September 1, 1870; that the full amount of said bonds were issued, and after said defendant railway company took possession of said railroad as aforesaid, and on the 3d of June, 1879, it paid the full amount of said bonds and interest. That the above mentioned mortgages have never been satisfied of record, and now stand open upon the records unsatisfied, and no instrument for the release of any of them has ever been made or executed; that when the defendant railway company paid the said bonds, as aforesaid, it was in the possession and use of the railroad property and franchises in question, and has ever since continued in the use and possession thereof; that it paid said bonds in the belief that it had acquired the legal title to the property and franchises in question,

and for the purpose of protecting and upholding its title and possession, and with the intention of keeping said mortgages alive, and not merging them wits its title, and of becoming subrogated to the rights of the mortgagees in each of said mortgages; that the trustees in the mortgage in suit have not, nor has either of them, nor have the bondholders of the said mortgage, or any of them, redeemed any of said mortgages; that the complainants never had any right under their said mortgage that did not involve redemption of or from the aforesaid mortgages as an essential element; that such right of redemption accrued to said trustees and became complete in them more than 10 years before the bill of complaint herein was filed, and that the benefit of sections 4206, 4219, and subdivision 4 of section 4221, of chapter 177 of the Revised Statutes of Wisconsin for the year 1878, is claimed and pleaded in bar of the maintenance of this suit. (8) It avers that after the decree had been entered in the James suit, and on the 2d day of March, 1867, Albert C. Gunnison and Aaron S. Bright filed their sworn petition in the court in which said James decree was entered, setting forth, among other things, that they were the owners of over 7,000 shares of the capital stock of the Minnesota Company, and praying, among other things, for leave to appeal from that decree to the supreme court of the United States in the name of the Minnesota Company; that their petition was allowed, whereupon they took and prosecuted an appeal from said decree to the supreme court of the United States, and assigned the following errors, for which they asked a reversal of said decree, to wit: First. Because it (the decree) declares and decrees that the Cleveland judgment was a lien upon the franchises of the La Crosse & Milwaukee Railroad Company as of the date of the docketing of the judgment, October 7, 1857. Second. That the judgment of Cleveland against the La Crosse & Milwaukee Railroad Company never was a lien upon the property described in the decree. That said appeal was argued by counsel in their behalf, before said supreme court, and on the 16th day of March, 1868, that court rendered its judgment therein affirming said decree in all things; wherefore said defendant railway company says that the complainants herein, Albert C. Gunnison and George A. Bright, the administrator of the estate of Aaron S. Bright, deceased, are bound by the decree in said James suit, and are estopped from claiming or asserting, as against the defendant railway company, that the Cleveland judgment was not a lien upon the railroad and franchises of the La Crosse Company. (9) It avers that by lapse of time and laches on the part of the trustees and of said Gunnison and Bright the complainants have no standing in a court of equity, and no right to the relief prayed for in the bill as against the defendant Chicago, Milwaukee & St. Paul Railway Company, and that they are estopped and precluded from maintaining this suit, setting forth the facts in detail upon which the claim of laches is founded. (10) Further answering, it avers that it went into possession of the railroad property in question on the 6th day of March, 1867, under claim of title, exclusive of any other right, founding such claim upon a written instrument, to wit, the marshal's deed aforesaid, and has been in continuous occupation and possession of the property included in said marshal's deed under such claim for 30 years and upwards, prior to the commencement of this suit; that said premises have during said 30 years and upwards, and still are, held adversely to the complainants and all the world; that said occupation and possession have been open, notorious, exclusive, and adverse as aforesaid, and that such possession constitutes, under the statutes of the state of Wisconsin, a bar to this suit, and it insists upon the benefit of such statutes in that behalf, as a limitation and bar to this suit, with like effect as if the same had been set up by way of plea. A like claim is made by virtue of like possession of said railroad and property by the defendant company under a claim founded upon a judgment of a competent court, to wit, upon the judgment of the circuit court of the United States for the district of Wisconsin, and it is averred that such possession, under such claim under the statutes of the state of Wisconsin, constitutes a bar to this suit.

After replication to the answer was filed, the parties proceeded to put in their proofs, which are quite voluminous.

Spooner, Sanborn & Spooner (John C. Spooner, William F. Vilas, and Burr W. Jones, of counsel), for complainants.

Burton Hanson and C. H. Van Alstine (George R. Peck, of counsel), for defendant, Chicago, M. & St. P. Ry. Co.

Upon this statement of the case, BUNN, District Judge, delivered the opinion of the court.

This case was first before the court on demurrer to the bill some four years ago. Several days were consumed in the argument, upon which the demurrer was overruled, and the defendant required to answer. Now it is here upon the merits. Most of the witnesses who might know about the transactions of 40 years ago are dead. Several of those who have given their testimony have died since the suit was commenced. Much time has been consumed in the oral argument,—I believe some two weeks,—and elaborate briefs have been filed. I have given the case a careful and extended consideration, and the conclusion I have reached is that there is not much equity in the complainants' case. I think complainants' counsel have felt the difficulty all the way through of meeting the objections founded upon the great lapse of time since the bonds were issued and since suit might have been brought to enforce relief, with defendants all the time in possession claiming title. There is one consideration, and but one, that makes in favor of the complainants' case. The $600,000 of bonds were issued by the Minnesota Company in 1864, and not a dollar of principal or interest has ever been paid. That company was of short life, and went out of existence soon after the bonds were issued, so that there was no legal responsibility anywhere for the payment of the bonds. But this fact of itself should have put the bondholders and their trustees on their guard to pursue with all the more vigilance any remedy in equity they might have against the property. They knew that the property was in the hands of the Milwaukee Company under claim of title by virtue of the sale under the Cleveland-James judgment, as against the mortgage in suit. They knew that the Milwaukee Company was making large improvements on the property, and incorporating the road into their general system, and that it was paying off large mortgages that constituted prior liens upon the road. Up to December, 1867, when the appeal in the James suit was decided by the supreme court (see 6 Wall. 752, 18 L. Ed. 885) adversely to their claim, it may be conceded that they did all that could be done to enforce their claim. But from December, 1867, the fight was practically relinquished, although the suit brought in the United States circuit court for Wisconsin was permitted to remain on the docket of the court for some four years, until 1872, but counsel for the Milwaukee Company was informed that he need not answer the bill unless notified to do so. From the time that suit in 1872 was dismissed nothing has been done by way of asserting any equitable claim under the mortgage. This is certainly a long time to wait, and if the equitable doctrine of laches has any application to this case there is no lack in the one element of time.

But perhaps the first question, as bearing upon the equities of the case, relates to the amount of bonds actually sold by the Minnesota Company; for it is only these that are entitled to any equitable consideration. The evidence on this subject is very interesting, and at the same time very shadowy. I cannot think it is at all satisfactory as to more than a very few of the bonds. Gunnison and Bright claim to own $500,000 of the $600,000 issued. $350,000 of this $500,000 are the bonds turned over as collateral security to the Philadelphia party. In 1865 the Minnesota Company was in hard straits for money to run the road. Indeed, it never had either money or credit. It had got possession, but it wanted money, and the bonds did not seem to bring money. It borrowed $450,000 of Scott and Thompson, of the Pennsylvania Company, and as part security put up $350,000 of the company's bonds, together with a majority of its capital stock and certain decretal orders amounting to $300,000. After the Milwaukee Company was put in possession under the James decree, the Philadelphia parties became alarmed, and a settlement was made between them, the Milwaukee Company, and the Minnesota Company, as a result of which Scott and Thompson canceled the indebtedness of the Minnesota Company, and returned to it the 350 bonds, with the capital stock; Aaron S. Bright, as president of the Minnesota Company, receiving and receipting for both stock and bonds. This was in December, 1867. Bright was the president, and Gunnison vice president, of the Minnesota Company. There is no evidence that these bonds were ever sold. Complainant Gunnison testifies that, within a few years after they had been placed in the hands of Scott and Thompson as collateral security, he saw all of them in the hands of Aaron S. Bright, who made the settlement with Scott and Thompson, and that he then exchanged with Bright a half interest in the capital stock, which he claimed to own, for a half interest in the 350 bonds which Bright told him he had purchased from Scott. This is the rather unsatisfactory way in which Gunnison puts it in his testimony: "We just divided. Being old acquaintances, we just divided, and went into the thing. Whatever there was of it, we divided it." From this and the other testimony it would seem as though Gunnison and Bright looked upon themselves as the Minnesota Company, with full right to divide the stock and bonds between them. If they appropriated these bonds to their own use without authority of law, what equitable claim have they here after the lapse of 30 years? But it is said we should not look into this question now, but refer the case to a master to take testimony. But no doubt all the testimony is taken that could be on these questions, and more than could be taken now after Gunnison, Bright, and other witnesses have passed away since giving their evidence in this case. Besides, I only refer to the question of title as bearing on the equities of the complainants' claim. These bonds have never had any market value. The testimony shows that they have always been considered as worthless, and when 146 of them were found among the assets of the Griffiths estate they were not accounted worth inventorying, and were not inventoried or any value set upon them, although the estate was insolvent, and paid but 50 cents on the dollar of its debts. After lying in musty boxes and gar-

.rets for 35 years, if they are now to be brought forth and made the foundation for a foreclosure and sale of the property covered by the mortgage then there should be some good showing as to the sale of the bonds to furnish an equity. The statement that Bright bought these bonds of Scott and Thompson has no foundation in fact. The testimony shows well enough what that transaction was. The bonds were turned over to Scott and Thompson as collateral, and when Scott and Thompson's claim was paid they were handed back to Bright, as president of the company, with other collaterals, including the capital stock of the company, Bright receiving and receipting for them as president of the company. I am satisfied that Gunnison and Bright took the bonds without authority, and divided them between them. According to Gunnison's testimony, when this division was made he took all the 350 bonds, and put them in a safe-deposit vault in New York, where they remained until 1896. Dwight W. Keyes was secretary of the Minnesota Company from its organization, in 1859, until 1865, on a salary, which was never paid, of $500. In April, 1868, he obtained judgment against the company in the circuit court of Milwaukee county for $3,300 for his services as secretary. He testified that he had known Gunnison well for a long time; that Gunnison, when he (Keyes) signed the bonds in 1864, promised that he would see him paid; that after he obtained his judgment he wrote to Gunnison if he could not find some way of satisfying his claim, and that Gunnison answered that the company had no money, but that they had some bonds and stocks that had been returned from Scott and Thompson, and if he would take some of them in settlement he would talk with Bright about it, and get the company to vote the allowance; that he (Keyes), who resided in Cleveland, was in Milwaukee shortly after, and went to see John W. Cary about it, who advised him that the stock and bonds were worthless and that he had better keep his judgment; that he afterwards garnished the Milwaukee Company, but that Cary knocked him out, and he never got anything for his services as secretary. The testimony shows that these 350 bonds were the only ones in the possession of Gunnison and Bright at the commencement of this suit, notwithstanding the allegations in the bill that they are the lawful owners and holders of 500 of said 600 bonds of the Minnesota Company. How they came to have these bonds in their possession, as well as the character of their title, has already been seen.

Now, as to the other 150 bonds to make up the 500 claimed by Gunnison and Bright, who were the promoters of this suit, though since deceased. These were sold soon after being issued, probably in 1865, to William R. Griffiths. According to Gunnison's first testimony, it was 200 bonds or a little less. Afterwards, when asked if he knew how many Griffiths did take, he answered, "between 150 and 175." This number is shown by the whole testimony to be an even 150. Griffiths was at that time a man of some means. He lived in New York, and died in 1876. Chas. E. Hackley, one of complainants' witnesses, testifies that he was sole executor of Griffiths' estate; that he returned and appraised everything that Griffiths left that could be found; that he found among his effects 146 of these

bonds, which were appraised at a nominal value; that in 1881 he rendered his final account to the surrogate court, and that these bonds were decreed to be worthless. The estate was insolvent, and paid less than 50 cents on the dollar, the legatees receiving nothing. This bill was filed on March 30, 1897. Hackley testifies that the 146 bonds remained in his possession up to September, 1898, some 18 months after this suit was commenced; this being the only thing, as he says, he could do with them, unless he burned them. Then, under the advice of counsel, he refuses to state what he did with them. There are many pages of the record made up of questions on cross-examination put to Gunnison, Bright, and Hackley as to these and the other bonds in suit, with refusals to answer. This may be one way to try cases. But the court in an equity case is desirous of finding the truth, and this mode of examination is not very conducive to such an end. All such questions as these the witnesses refuse, under advice of counsel, to answer: "Was Mr. Gunnison the party who obtained these bonds of you in 1898?" "Who purchased them?" "Did the party who took these bonds from you state that they had been put up as collateral for a loan to him and Aaron S. Bright from Griffiths?" Hackley testified, however, that at the time he disposed of the 146 bonds, in 1898, he did not regard them of any value; for, if he had, he would not have sold them.

Afterwards, however, when Dr. Hackley, in 1900, was called to further testify before the special examiner, he testified that on September 16, 1898, he sold the 146 bonds to Albert C. Gunnison for $500. What title he had or what right to sell them is not apparent, as he had settled the estate, and was no longer administrator. And this about represents the percentage of equity that Gunnison and Bright have in this suit. They have bought $146,000 of bonds for $500, some 18 months after the suit was begun, in the spring of 1897. When suit was commenced, they had no interest whatever. They, after waiting 35 years, have paid $500 on a mere speculative venture, and have got bonds in their possession amounting to $496,000, with interest at 8 per cent. from 1864: Four of the 150 bonds sold to Griffiths he sold to Dr. Hackley, who still holds them, and these 4 bonds have, no doubt, the best standing of any in this court. Fifty other bonds Gunnison testifies were sold to Troy parties in 1865 for $50,000. This seems somewhat incredible, and I think, considering the rather unsatisfactory nature of Gunnison's other testimony, may be taken with some grain of allowance. How one block of bonds should be sold for 50 cents on the dollar, and another at about the same time at par, is not very apparent. Gunnison testifies that he does not know what became of the other 100 bonds required to make up the 600. As late as June 2, 1899, he testified that the "about 500" bonds which he and Bright claimed, which included the 350 turned over as collateral to Scott and Thompson, and the Griffiths bonds, were all of the 600 that he knew anything about, and yet it is a significant circumstance that the persons in Troy who, for years, had these bonds in their possession, and from whom the parties who now hold them took them, were relatives and friends of Gunnison. These bonds, amounting to 51, are still in the hands of par-

ties residing at Troy. The remaining 49 bonds were never negotiated at all.

The question naturally arises at this point, without going further into the case, whether a court of equity, after such lapse of time and the great uncertainty of the testimony, will put forth its powers in aid of those who have ventured so small a sum to take the chances on so great a windfall as the foreclosure of this mortgage, with the accumulated interest, would be. In view of the maxims that "he who comes into equity must come with clean hands," and "he who hath committed iniquity shall not have equity," it would seem quite clear that there is not any very strong call on the conscience of the court to grant the relief sought. On the contrary, the court is asked to order the sale of property valued at several millions of dollars in order to enable Gunnison and Bright to realize upon a long standing venture of embezzlement and speculation.

But the great and controlling interest in the case centers about the question of the effect to be given to the sale under the decree rendered for a sale to satisfy the Cleveland judgment. Was the effect of that foreclosure like that of the foreclosure of a mortgage? Or when the sale was made had it the effect of a sale on the judgment? There are no authorities directly in point upon this question. But the supreme court, upon appeal in the James suit, held that the judgment became a lien on the railroad in question from the time of its rendition, and that the sale thereunder passed to the purchaser the whole of the interest which the La Crosse Company had in the road at the time of the rendition of that judgment. I see no reason for thinking there was anything extrajudicial about such language, or that the court did not mean to give full effect to what it said. And if what the court said is true, that the sale took all the title there was in the La Crosse Company at the date of the rendition of the judgment, then it took the title represented by the mortgage in suit. And I see nothing inconsistent in such a doctrine. It is only giving full effect to the judgment. The road could not be sold separate from the franchise. And execution could not issue upon the judgment for the sale of the franchise, which is an incorporeal hereditament. The judgment was worthless unless equity would overcome this technical rule of the common law, and allow a sale to satisfy the judgment. But equity does not do things by halves. When it steps in to do justice because of some imperfection or too great generalty of the common law, it gives a full measure of relief, according to the nature of the case. But full measure in this case would mean that the judgment creditor should have what his judgment would give him if the law allowed a fieri facias. If it be equitable for a court to order a sale, why should it not afford a full measure of relief, and give the judgment creditor the full benefit of the principle of finality attaching to all judgments? When the sale takes place it is like a sale on the judgment with the like effect. There would seem to be no reason why, if equity will interfere at all to allow a sale, that when it is made it should be considered as a sale on an ordinary foreclosure of a mortgage. That would not give the measure of relief which equity always intends, but would convert the lien of the judgment into

something equivalent to the lien of a mortgage which has not the quality of finality attaching to judgment liens. Probably the supreme court meant all this when it said by Mr. Justice Nelson in the James Case that, "by the statute law of Wisconsin, judgments are liens on real estate, and we do not doubt but that this judgment became a lien on the road from the time of its rendition, and that a sale under a decree in chancery, and conveyance in pursuance thereof, confirmed by the court, passed the whole of the interest of the company existing at the time of its rendition to the purchaser." Railroad Co. v. James, 6 Wall. 750, 18 L. Ed. 854.

And this was evidently the view taken by Judge Dyer when the question of the effect of the sale on the James decree came before him, in Howard v. Railroad Co., 7 Biss. 73, Fed. Cas. No. 6,761. By the whole of the interest which the La Crosse Company had in the road at the time of the rendition of the judgment, no doubt the supreme court intended not alone the roadbed, rails, and right of way, but the right to maintain and operate the road. This franchise was inseparable from the ownership of the road, and without it a railroad would be of no value. Morgan v. Louisiana, 93 U. S. 217, 23 L. Ed. 860. This incorporeal right or franchise could not be sold upon a common-law fieri facias. Equity, therefore, stepped in and removed this technical objection in order to do justice, and allowed the franchise to run the road as well as the road itself to be sold to satisfy the judgment; so that the only equity that the Minnesota Company or any subsequent incumbrancer had after sale was to redeem from that sale. This there was never any attempt to do, although some 35 years have elapsed.

Besides this, so far as the principal claimants, Gunnison and Bright, are concerned, it seems quite evident that they are bound by the decision of the supreme court in the James suit. They were stockholders in the Minnesota Company, and as such prayed and were allowed an appeal in the name of the company. They litigated in the supreme court the right of the La Crosse & Milwaukee Company to the possession and ownership of this road under the decree and marshal's deed in the James suit. They were defeated in that litigation. Now, as bondholders after over 30 years of delay on their part and adverse possession on the part of the defendants, they propose to contest the company's right to the road. This, I think, they are estopped from doing. Railroad Co. v. U. S., 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355; Jackson v. Lodge, 36 Cal. 28.

The evidence, I think, also discloses at least two other complete defenses to this suit, both founded upon the delay which is so obvious a feature in this case. One of these defenses is founded upon the statutes of limitation, the other upon laches, and may be considered together.

The Wisconsin 10-year statute of limitations seems to me applicable to the case. That statute is as follows (Rev. St. 1898, § 4211):

"Where the occupant, or those under whom he claims, entered into the possession of any premises under claim of title, exclusive of any other right, founding such claim upon some written instrument, as being a conveyance of the premises in question, or upon the judgment of some competent court,

and there has been a continual occupation and possession of the premises, included in such instrument or judgment under such claim, for ten years, the premises shall be deemed to have been held adversely."

It is difficult to see wherein the evidence in this case fails to satisfy every condition and requirement of this statute. The defendants went into possession under the decree of the United States circuit court for Wisconsin, and the marshal's deed made on the sale, on March 5, 1867, claiming title as against the complainants and all the world, subject to the several prior mortgages on the property, and have remained in possession continuously ever since. It was 30 years from the time defendants went into possession, in March, 1867, to the commencement of this suit, in March, 1897, and I think the evidence shows that the defendants have held the premises adversely all that time. There is every element of adverse possession in the case. The bondholders were not made parties to the bill in equity for a decree to sell on the judgment, because it was not considered necessary. The Milwaukee Company went into possession under the marshal's deed, claiming title as against the mortgagees. The supreme court affirmed its right by an affirmance of the James decree. That company has shown its good faith in its claim of title by paying off several millions of mortgage and judgment liens that were prior to its decree and prior to the claim of these mortgagees, by vastly improving the property, and incorporating it into its general system of railroads, constituting one of the great railroad systems of the country. The company has never paid any interest on the bonds in suit nor in any way recognized the existence of the mortgage as a claim against the property. Under these circumstances, to lie by and make no sign or claim for 30 years estops the bondholders from making the claim now.

Allowing for the moment that the sale under the James judgment did not take all the title of the La Crosse Company in the road from the day of its rendition, in 1867, as the supreme court said it did, still this is the claim that the company made when it went into possession, and has always made, and this was well known to Gunnison and Bright and Griffiths, and all who made any claim under the Minnesota Company. The appeal to the supreme court was taken to contest that claim. The suit by Scribner, brought by Mr. Stark in the United States court for Wisconsin in 1868, after the James decree was made by that court, was brought to contest the same claim of the Milwaukee Company. If there had been any intention to press the claim under the mortgage in suit after the decision of the supreme court in the James suit, it should not have been abandoned, but that suit in Milwaukee should have been pressed to hearing. But the case was allowed to remain on the calendar of the court for nearly four years, Mr. Cary, the counsel for the Milwaukee Company, being told that he need not answer unless required by notice to do so, until finally, in 1872, the suit was dismissed. After the dismissal of that suit, with the defendants in possession making valuable improvements and paying off prior liens, it was negligence for the bondholders to lie by for 25 years without pressing their claims. The fact, quite apparent from all the circumstances, is that, when the suit

in Milwaukee was dismissed by Mr. Stark, the Gunnison and Bright parties gave up the fight. They had been beaten at every point, and they were ready to throw up the sponge.

There is a bit of testimony by Mr. Stark, who had been the attorney for the Minnesota Company, and was the attorney for Gunnison and Bright in the litigation in Milwaukee and in the supreme court, that is quite significant. Speaking of the appeal in the James suit and in another case, he says:

"As those appeals resulted adversely to the Milwaukee and Minnesota Company, and resulted in the establishment of the title to the Eastern Division of the road which the Milwaukee and St. Paul Company claimed under the foreclosure of the Cleveland judgment in the James suit, it was very disconcerting to the parties interested."

This is, no doubt, the way his clients also felt, and no doubt furnishes a clue to the reason for not pressing the Scribner suit. If the decision of the supreme court in the James suit was disconcerting in 1867, it is perhaps quite as disconcerting now, after the lapse of 35 years.

A point has been made that there is not sufficient evidence that Joshua Stark had written authority from the trustees of the bondholders to commence that suit. But the presumption is strong that he had proper authority. He was then, and still is, an able and responsible attorney in high standing. The presumption is strong, and is not shaken by anything in the testimony, that he had authority. After instituting the suit at the instance of Gunnison and Bright, he wrote and telegraphed for written authority from the trustees. He thinks he had it, though after the lapse of 35 years he cannot find it amongst his papers, which is no great wonder. I think the above-named statute began to run on the complainants' claim when the Milwaukee Company went into possession, in March, 1867, and from that time the company has held the property adversely. See Barnes v. Railway Co., 122 U. S. 1, 7 Sup. Ct. 1043, 30 L. Ed. 1128, where the supreme court, by Chief Justice Waite, says: "Under this decree the property was sold and conveyed to the St. Paul Company, March 2, 1867, for $100,920.94, and from that time that company has been in possession claiming title adversely to the Minnesota Company and to the Barnes mortgage." North v. Hammer, 34 Wis. 425.

I also think that laches commenced to run from a time soon after the Scribner suit was begun at Milwaukee. All the relief could have been had in that suit which could be had in this, and it was great negligence, if they desired to make any further claim to the property after the decision of the supreme court, to allow the suit in the United States circuit court at Milwaukee to remain unmoved for four years, and then to have it dismissed. By the discontinuance of that suit the Milwaukee Company had grounds for believing that the trustees and bondholders had decided to acquiesce in the decision of the supreme court in the James suit, and make no further claim that the title of that company was subject to their mortgage. The Scribner bill attacked the Cleveland judgment, and the title which the St. Paul Company claimed under the sale and marshal's deed, averring that the judgment was never a lien upon the railroad and

franchises of the La Crosse Company, and that the mortgage in suit was not lawfully subject to the judgment thereof. The appeal in the James suit was pending in the supreme court when the Scribner bill was filed, and within two months the decision of the court was announced affirming the decree and the right of the Milwaukee Company to the road and franchise under the sale. The most natural thing to have done after that decree was rendered was to discontinue the Scribner suit, but instead of that the attorney advised Mr. Cary, counsel for the Milwaukee Company, that he need not answer the bill unless they gave him timely notice to do so, but kept the suit in court without further proceedings for nearly four years, when in 1872 the bill was voluntarily dismissed by complainants.

Again, at the time the Scribner bill was filed the Minnesota Company was in default for nonpayment of interest, aggregating $144,000, and when the bill was dismissed the defaulted interest amounted to $336,000; that is, supposing bonds were issued and sold as claimed by the complainants. A foreclosure may have been begun for default in the payment of interest, which might have resulted in the sale of the road. No such suit, however, was ever commenced. See Toler v. Railroad Co. (C. C.) 67 Fed. 181; Railroad Co. v. Fosdick, 106 U. S. 47, 27 L. Ed. 47; Howell v. Railroad Co., 94 U. S. 463, 24 L. Ed. 254.

The doctrine in regard to laches is very clearly laid down by the supreme court in Halsted v. Grinnan, 152 U. S. 412; and by the same judge in Naddo v. Bardon, 2 C. C. A. 335, 51 Fed. 493, 14 Sup. Ct. 641, 38 L. Ed. 495; and by Chief Justice Fuller in Hammond v. Hopkins, 143 U. S. 224, 12 Sup. Ct. 418, 36 L. Ed. 134; 2 Pom. Eq. Jur. § 816; Simmons v. Railroad Co., 159 U. S. 278, 16 Sup. Ct. 1, 40 L. Ed. 150.

Furthermore, it seems a matter of much doubt whether the usual 20-year statute applicable to actions upon sealed instruments does not apply to this case. Though the principal of the bonds, by their terms, was not due until 1884, the Minnesota Company went out of existence as early as 1872; so that the only remedy the bondholders had was in equity against the property. That company surrendered its franchise to the state in 1872, or prior to that time, which surrender was accepted by the state, which surrender and acceptance constituted a dissolution of the corporation. The allegations of the bill in this case show that the company was dissolved more than 25 years prior to the filing of the bill, and, aside from the pleadings, the evidence shows a dissolution as early as 1869–72. The Milwaukee Company went into possession on March 6, 1867, under the sale upon the Cleveland judgment and James decree, and has remained in undisturbed possession ever since. There being no legal remedy of which the bondholders could avail themselves, it would seem a reasonable proposition that their remedy, whatever it was, against the property should be pressed within the 20 years from the time the cause of action in equity arose, without reference to the time the bonds fell due by their terms. But I am satisfied to place the decision of this case upon the grounds already discussed: (1) That the sale under the James decree took the entire title of the La Crosse

& Milwaukee Company which it had at the date of the rendition of the judgment on October 7, 1857, long before the Minnesota Company was formed or the bonds in suit issued; (2) that the 10-year statute of limitations provided by the laws of Wisconsin had run upon the claim long before the suit was begun, to wit, on or about March 6, 1877; (3) that the gross laches of the trustees and bondholders in not pressing the claim sooner, after full knowledge that the Milwaukee Company had gone into possession of the property under claim of title which was adverse to their interest, making large and valuable improvements, and paying off some $3,000,000 of prior liens, are such as make a foreclosure at this late day unjust and inequitable.

The bill of complaint is dismissed for want of equity, with costs.